IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JORGE JUAREZ MORALES,<br><br>Defendant. | Case No. CR10-3055<br><br>REPORT AND RECOMMENDATION |

## TABLE OF CONTENTS

I.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . 2

III. RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.  DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     A.   Did Defendant Voluntarily Waive His Miranda Rights?. . . . . . . . . . 5
     B.   Was Defendant's Statement Voluntary?. . . . . . . . . . . . . . . . . 9

V.   SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VI.  RECOMMENDATION. . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## I. INTRODUCTION

On the 10th day of February 2011, this matter came on for hearing on the Motion to Suppress (docket number 23) filed by Defendant Jorge Morales Juarez on February 1, 2011, and the Resistance (docket number 26) filed by the Government on February 8, 2011. The Government was represented by Special Assistant United States Attorney Justin A. Lightfoot. Defendant Jorge Juarez Morales appeared personally and was represented by his attorney, Clemens Erdahl.

1

## II. PROCEDURAL HISTORY

On December 15, 2010, Defendant Jorge Juarez Morales was charged by Indictment (docket number 2) with one count of conspiracy to distribute methamphetamine (Count 1) and two counts of distributing methamphetamine (Counts 2 and 3). At the arraignment on December 21, 2010, Defendant entered a plea of not guilty. Trial was initially scheduled for February 22, 2011, but later rescheduled for March 21, 2011, at Defendant's request.

On February 1, 2011, Defendant filed the instant motion to suppress.[1]

## III. RELEVANT FACTS

During the early afternoon on December 20, 2010, officers of the North Central Iowa Narcotics Task Force proceeded to an apartment building on 1st Street in Hampton, Iowa. The officers had a warrant for Defendant's arrest, which was issued in the instant action on December 15, 2010. The officers also had a search warrant for Defendant's apartment, #205, issued by a judicial magistrate earlier that day. Altogether, there were 10-15 officers involved in the operation.

With a copy of the arrest warrant and search warrant in hand, Franklin County Deputy Sheriff Aaron Dodd "knocked and announced" at the door of Defendant's apartment at approximately 1:15 p.m. Defendant's girlfriend, Jenny Perez, answered the door.[2] Defendant was not in the apartment at the time, but the officers learned he could be located "around the corner" in the apartment of Luis Rodriguez Garabito, #210. The officers then proceeded to apartment 210, advised Defendant that they had a warrant for his arrest, placed him in handcuffs, and returned him to apartment 205.

---

[1] The Court's initial Trial Scheduling Order (docket number 10) required nontrial-related motions, including motions to suppress evidence, to be filed within 28 days after the date of the first arraignment. Accordingly, the deadline for filing a motion to suppress was January 18, 2011. On January 10, 2011, however, Defendant's initial court-appointed counsel was permitted to withdraw due to a conflict of interest, and attorney Clemens Erdahl was appointed to represent Defendant. The Government does not argue that the motion was not timely filed and, under these circumstances, the Court concludes that the motion should be considered timely.

[2] Defendant is the father of one of Ms. Perez's two children.

Special Agent Ryan Moore of the Iowa Division of Narcotics Enforcement testified that upon returning to his apartment, Defendant asked to sit down. The handcuffs were moved from behind Defendant's back to the front, and Defendant was seated on a small couch in the living room of his apartment. Ms. Perez was sitting on an adjacent chair. A 3-month-old infant was sitting in a "bouncy chair," and a 4-year-old boy was playing and moving about the apartment. The officers in the living room with Defendant included Special Agent Moore, Deputy Dodd, and Special Agent Josh Mulnix.[3] The only furniture in the living room was the small couch and chair, and the three officers were all standing. Moore estimated that the officers were standing eight to ten feet from Defendant, who was sitting on the couch, but also testified that the room was "12 by 12 maybe at the most."

Special Agent Moore asked Defendant whether he understood English, and Defendant responded he did understand English. Moore then read the Miranda warning to Defendant in English, using the "DEA 13 card." Moore asked Defendant whether he understood, and Defendant said he did. According to Moore, he also informed Defendant that there was a Spanish-speaking officer available in apartment 210.[4] Defendant "didn't really say a whole lot" in response to that information, and did not ask to speak with the Spanish-speaking officer.

Special Agent Moore testified that after receiving the Miranda warning, Defendant said he was willing to cooperate and talk to the officers. Moore then questioned Defendant regarding his involvement in the distribution of methamphetamine. Moore denied that Ms. Perez was used as an interpreter during the questioning, but testified that she "interjected a few questions in English towards us" and that Ms. Perez and Defendant "spoke to each other in Spanish." Moore denied that Ms. Perez ever indicated Defendant

---

[3] According to Special Agent Moore, Deputy Matt Klunder entered the apartment later in order to search the back bedroom and restroom area.

[4] Chief Ray Beltran of the Hampton Police Department was part of the team that executed the arrest warrant and search warrant, and was apparently talking with Rodriguez-Garabito in apartment 210.

3

wanted to invoke his right to remain silent or invoke his right to an attorney. At one point, Ms. Perez asked if Defendant "should get an attorney." According to Moore, "I said it's completely up to Mr. Juarez; he was more than welcome to call an attorney and they said something in Spanish and Mr. Morales Juarez said he wanted to talk."

According to Special Agent Moore, Defendant's answers were responsive, "logical," and "coherent." At no time did Defendant ever state that "he didn't understand or wanted an interpreter." According to Moore, Defendant's answers "were in line with the questions I asked him every time." Defendant never indicated that he wanted to remain silent or wanted an attorney.

In response to questioning by Defendant's attorney, Special Agent Moore testified that some of Defendant's answers were lengthy, and "it was a normal interview interrogation." According to Moore, "he answered every question the way I would expect a normal English-speaking person to answer them." Moore opined that Defendant "fully understood what I was talking about." When asked by the prosecutor whether he had "any idea that Defendant would later say he didn't understand English," Moore replied that on that day Defendant "spoke perfect English" and he "did not foresee anything happening."

Deputy Dodd's testimony was consistent with that given by Special Agent Moore. According to Dodd, Moore told Defendant that he was going to read him his *Miranda* rights, and asked whether he understood English. Defendant responded "yes," and Defendant was then given a *Miranda* warning. According to Dodd, Defendant was also told that "Chief Beltran was in the building and just right around the corner." Dodd testified that he "thinks" that Moore asked Defendant if he would like to have Chief Beltran translate. Dodd denied that Ms. Perez was used as an interpreter.

After the *Miranda* warning was read to Defendant, he spoke briefly with Ms. Perez in Spanish. According to Deputy Dodd, Defendant then said "yeah or okay" and then answered "yes, I'll talk, or I will talk." Defendant did not request an attorney or invoke his right to remain silent at any time. Ms. Perez asked if Defendant "should have an

4

attorney," and Dodd testified that "I think we responded that's his right." Defendant and Ms. Perez then spoke again in Spanish, but Defendant then continued to answer the officers' questions. According to Dodd, Defendant's answers "were clear enough and to the point." Dodd testified the officers "had no trouble understanding his English."

Also testifying at the hearing was Defendant's girlfriend, Jenny Perez. According to Perez, when Special Agent Moore asked Defendant if he spoke English, Defendant responded "a little bit." Perez denied that the officers said anything about a Spanish-speaking officer being available to translate. Perez was familiar with the fact that Chief Beltran was associated with the Hampton Police Department, but denied that his name was mentioned at any time during the encounter. Perez also denied that Defendant was read a *Miranda* warning, or that anything was said to him about his right to remain silent or his right to an attorney. Perez acknowledged that Defendant answered the officers' questions in English, but testified that the answers were not lengthy and Defendant "just usually said yes or no."

## IV. DISCUSSION

While it is not entirely clear from his brief, Defendant apparently asserts two arguments in support of his request that any statements given to law enforcement officers on December 20, 2010 be suppressed. First, Defendant asserts that he did not voluntarily waive his *Miranda* rights. Second, Defendant asserts that his subsequent statement was not given voluntarily. The Court will address the arguments in turn.

### A. Did Defendant Voluntarily Waive His Miranda Rights?

Preliminarily, the Court must determine whether Defendant was given a *Miranda* warning. It is undisputed that "[l]aw enforcement officials must administer *Miranda* warnings before interrogating individuals in their custody." *United States v. Elzahabi*, 557 F.3d 879, 883 (8th Cir. 2009). Here, Defendant was undoubtedly in custody when questioned by officers in his apartment. Accordingly, it was incumbent upon the officers to give Defendant a *Miranda* warning.

5

Defendant's girlfriend, Jenny Perez, denied that Defendant was read a *Miranda* warning, or that anything was said to him about his right to remain silent or his right to an attorney. That testimony is directly contradicted, however, by the testimony of Special Agent Moore and Deputy Dodd. Both officers testified that Moore read a *Miranda* warning to Defendant, using a standardized card. The Court finds the testimony of the officers to be more credible in this regard. That is, I find that Defendant was read a *Miranda* warning in English.

The Court must then determine whether Defendant knowingly and voluntarily waived his right to remain silent and his right to an attorney. "A waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right, and a waiver is 'voluntary' where the court can determine that the waiver was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception." *Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir. 2005). Here, Defendant contends that because of his limited understanding of English, he did not understand the *Miranda* warning and, therefore, could not voluntarily waive his rights. "A court must evaluate all of the attendant circumstances in determining whether a waiver was voluntarily made." *United States v. Henderson*, 553 F.3d 1163, 1165 (8th Cir. 2009).

The issue here is largely a factual one. That is, Defendant argues that his limited understanding of English prohibited him from knowingly and voluntarily waiving his Fifth Amendment rights. The officers testified, however, that Defendant gave "lengthy" answers to "open-ended" questions, and never said that "he didn't understand or wanted an interpreter." Defendant was questioned in English and responded in English. Defendant's answers were responsive to the questions and the officers "had no trouble understanding his English." While Defendant communicated with his girlfriend in Spanish, there is no evidence that Ms. Perez was used as an interpreter during the questioning.

6

The fact that a defendant's first language is not English is certainly a factor to be considered in determining whether a waiver of his *Miranda* rights is given knowingly and voluntarily. Clearly, however, one whose primary language is not English may still waive his constitutional rights if he has a sufficient understanding of those rights. *See, e.g., United States v. Marquez*, 605 F.3d 604, 609 (8th Cir. 2010) ("We find no reason to conclude that [the defendant] lacked the capacity to waive his *Miranda* rights, or that his waiver was anything but knowingly, voluntarily, and intelligently given."); *United States v. Perez*, 200 F.3d 576, 579 (8th Cir. 2000) (finding that the defendant's "limited English proficiency did not interfere with his ability to give knowing and voluntary consent to the search of his vehicle"); *United States v. Carrate*, 122 F.3d 666, 670 (8th Cir. 1997) (finding that despite the defendant's "supposed limited ability to speak English, he understood and appropriately answered all of the troopers' questions" and was able to give consent to search).

In his brief, Defendant relies primarily on *United States v. Garibay*, 143 F.3d 534 (9th Cir. 1998). There, the interrogating officer asked Garibay in English if he understood English, to which Garibay responded "yes." The officer then orally read a *Miranda* warning in English. Garibay indicated that he understood his rights, and made incriminating statements during the interrogation. Garibay subsequently argued that he did not understand the nature of the rights he was waiving because of his limited English skills and low mental capacity. The Ninth Circuit Court of Appeals concluded that "[i]n reviewing the totality of circumstances in which Garibay was interrogated, it is clear that he was not aware of the nature of the constitutional rights he was waiving, and that the district court clearly erred in finding that he knowingly and intelligently waived his *Miranda* rights." *Id.* at 535. I believe, however, that the facts in the instant action are distinguishable from *Garibay*. First, the defendant in *Garibay* had "borderline retarded IQ, and poor verbal comprehension skills." *Id.* at 538. Here, there is no evidence that Defendant is of below average intelligence. Second, in the instant action Defendant was

7

told that a Spanish-speaking officer was available to translate. The defendant in *Garibay* was not given that option. Third, while Garibay had "extremely low verbal-English comprehension skills," the officers in the instant action testified that Defendant's answers were responsive to the questions, lengthy, and logical. In fact, Special Agent Moore testified that Defendant spoke "perfect English" and he did not "foresee" that Defendant would later claim an inability to understand. In any event, the Court notes that *Garibay* has no precedential effect in the Northern District of Iowa.

After considering all of the facts and circumstances, the Court concludes that Defendant knowingly and voluntarily waived his *Miranda* rights and agreed to speak with the officers. Defendant told Special Agent Moore that he understood English and, after being read the *Miranda* warning, told the officers that "I will talk." Defendant responded to the officers' questions in English and the officers "had no trouble understanding his English." Defendant's answers were responsive and coherent. Accordingly, the Court finds that Defendant was properly advised of his *Miranda* rights and knowingly and voluntarily waived those rights. Therefore, Defendant is not entitled to relief on that ground.

The Court has not disregarded the testimony that at some point Defendant's girlfriend, Ms. Perez, asked the officers if Defendant "should have an attorney." "[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis v. United States*, 512 U.S. 452, 458 (1994). However, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* at 459 (italics in original). That is, "the suspect must unambiguously request counsel." *Id.* It is undisputed that Defendant did not unambiguously request counsel here.

8

### B. Was Defendant's Statement Voluntary?

Next, Defendant argues that "the setting [where the questioning occurred] was coercive" and that his statement was not made voluntarily. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004). "Whether a confession is involuntary is judged by the totality of the circumstances." *Id.* The Government must prove by a preponderance of the evidence that the challenged statements were voluntary. *Id.*

In *United States v. Chaidez*, 906 F.2d 377 (8th Cir. 1990), the Court described certain "suspects' characteristics" and "environmental" factors which may be considered in determining whether a person's consent to search was given voluntarily. In *United States v. Griffith*, 533 F.3d 979 (8th Cir. 2008), the Court adopted those factors in determining whether a suspect's post-arrest statement was given voluntarily. In determining whether his statement is voluntary, the Court may consider the following characteristics relating to the suspect:

> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

*Id.* at 984 (citing *Chaidez*, 906 F.2d at 381).

Here, Defendant is a young man who appears to be in his 20s. The record is silent regarding Defendant's education, but there is no evidence that he is of below-average intelligence. There is no evidence that Defendant was intoxicated or under the influence of drugs when he answered the officers' questions on December 20, 2010. As set forth above, Defendant's statements were made after being advised of his *Miranda* rights. The

record is silent regarding Defendant's prior contacts with law enforcement officers or the legal system.

In addition to the suspect's characteristics, the Court may also consider the following "environmental" factors:

> whether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

*Id.* (citing *Chaidez*, 906 F.2d at 381).

While the record is imprecise, Defendant was apparently not questioned for a lengthy period of time. Defendant's girlfriend was sitting nearby, two breaks were taken during the questioning, and there is no evidence that Defendant was deprived of food, drink, or restroom privileges. Furthermore, there is no evidence that Defendant was threatened or physically intimidated by the police, or that any promises or misrepresentations were made by the police. Defendant was able to freely communicate with his girlfriend during the questioning. While Defendant was in custody during the interrogation, the questioning occurred at his apartment.

The factors set forth in *Chaidez* are not to be applied "mechanically," but rather serve as a "guide" to the Court's analysis. *Id.* After considering all of the facts and circumstances, the Court concludes that the Government has met its burden of proving that Defendant's statements were given voluntarily. There is no evidence that Defendant's free will was overborne, or that his statement was extracted by threats or promises. Accordingly, I do not believe that Defendant is entitled to relief on this ground.

## V. SUMMARY

In summary, the evidence supports a finding that after ascertaining Defendant was able to understand English, the officers then gave Defendant a *Miranda* warning in English. Defendant indicated that he understood his rights and agreed to speak with the

officers. There was nothing unduly coercive about the questioning, and Defendant's statements were given knowingly and voluntarily. Accordingly, I believe Defendant's motion to suppress should be denied.

## VI. RECOMMENDATION

For the reasons set forth above, it is respectfully recommended that the Motion to Suppress (docket number 23) filed by Defendant on February 1, 2011 be **DENIED**.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on February 10, 2011.*

DATED this 14th day of February, 2011.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA